IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JUDY K. JONES, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. _____ |
| | ) | |
| vs. | ) | |
| | ) | |
| CUSTER COUNTY, a political subdivision; | ) | **COMPLAINT AND DEMAND** |
| CUSTER COUNTY ATTORNEY'S OFFICE, a | ) | **FOR JURY TRIAL** |
| Nebraska Political Subdivision, | ) | |
| STEVEN BOWERS, individually and in his | ) | |
| capacity as County Attorney for Custer County; | ) | |
| GLENN CLARK both individually and in his | ) | |
| capacity as Deputy County Attorney for Custer | ) | |
| County; NEBRASKA STATE PATROL, a state | ) | |
| agency; COL. DAVID SANKEY, Superintendent | ) | |
| of Law Enforcement and Public Safety for the | ) | |
| Nebraska State Patrol, individually and in his | ) | |
| official capacity; JEFF ROGERS, individually and | ) | |
| as an investigator of the Nebraska State Patrol; and | ) | |
| CHRIS KOBER, individually and as an investigator | ) | |
| of the Nebraska State Patrol, | ) | |
| | ) | |
| Defendants. | ) | |

JUDY K. JONES, plaintiff in the above-captioned matter, by and through her counsel of record, for her causes of action against defendants, states the following:

**PRELIMINARY STATEMENT**

1. This is a civil rights case arising out of the deprivation of Judy Jones's ("Jones") constitutional rights by defendants in a state criminal proceeding. Jones brings this case for monetary damages for violation of her civil rights under the First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the Federal Constitution. This action is brought pursuant to 42 U.S.C. § 1983.  At issue are the policies, procedures, practices, and customs of the County

1

of Custer, Nebraska, by and through the Custer County Attorney's Office and the Nebraska State Patrol.

2. Plaintiff was unconstitutionally extradited, arrested and maliciously prosecuted, on two different occasions, for the death of Eli Fenske, in which she had no role.  Ultimately, all charges against Plaintiff were dismissed by the Custer County Attorney on October 19, 2015. Plaintiff seeks damages for all Defendant Bower's and Defendant Clark's conspiratorial actions and the reckless and intentional actions of all named Defendants that deprived her of freedom to exercise her religious belief and ability to earn a living, and inflicted profound personal suffering on her that continues to this day.

## INTRODUCTION

3. This is a civil rights case arising out of the deprivation of Jones's constitutional rights by way of her wrongful prosecution for manslaughter, practicing midwifery without a license, criminal impersonation, child abuse for committing a negligent offense resulting in the death of a child and child abuse for committing a knowing and intentional offense which results in the death of a child  and seeking damages for the violation of her rights under U.S. Constitution, Amendments One, Four, Five, Six, Eight and Fourteen.  At issue are the policies, procedures, practices, and customs of Custer County, Nebraska, to include the Nebraska State Patrol and the Custer County Attorney's Office. Jones was willfully, maliciously, recklessly and unconstitutionally extradited, arrested, interrogated, prosecuted and incarcerated for manslaughter, practicing midwifery without a license, and criminal impersonation. Additionally, Plaintiff was willfully, maliciously, recklessly and unconstitutionally arrested and prosecuted for child abuse for committing a negligent offense resulting in the death of a child and child abuse for committing a knowing and intentional

2

offense which results in the death of a child, without any basis in law or fact. Defendants willfully, maliciously, recklessly, unconstitutionally and repeatedly prosecuted Jones without regard to the law and the United States Constitution, thereby violating her civil rights. Defendants willfully and intentionally ignored the laws of Nebraska and the facts of the case in order to prosecute Jones. Defendants ignored the evidence at not one, but two preliminary hearings, as well as available and obtainable exculpatory evidence to knowingly plow ahead with a baseless prosecution. Jones seeks damages for Defendants' willful, reckless, intentional, and unconstitutional deprivation of her right to be free from malicious prosecution, which deprived of her liberty and property and soiled her reputation in the community, thereby subjecting her to personal suffering and injury on her, which continues to this day.

## PARTIES

4. Plaintiff, Judy K. Jones, is an individual residing in Irene, Yankton County, South Dakota.

5. Defendant Custer County is a political subdivision of the State of Nebraska, and was properly notified under the requirements of the Nebraska Political Subdivision Tort Claims Act.

6. Defendant Cuter County Attorney's Office, is a Nebraska Political Subdivision.

7. Defendant Steven Bowers is the current County Attorney for Custer County and was the County Attorney of Custer County when the events described herein occurred.

8. Defendant Glenn Clark is a current Deputy County Attorney for Custer County and was a Deputy County Attorney for Custer County when the events described herein occurred.

9. The Nebraska State Patrol is a state law enforcement agency in the State of Nebraska.

10. Colonel David Sankey, the Superintendent of Law Enforcement and Public Safety for the State Patrol during all times material herein and at present.

11. Defendants Jeff Rogers, a current investigators for the Nebraska State Patrol and were investigators for the Nebraska State Patrol when the events described herein occurred.

12. Defendant Chris Kober, a current investigator for the Nebraska State Patrol and investigator for the Nebraska State Patrol when the events described herein occurred.

## JURISDICTION AND VENUE

13. This lawsuit involves the deprivation of Plaintiff's constitutionally guaranteed rights by Defendants under color of state law. It is brought pursuant to 42 U.S.C. § 1983.  Jurisdiction over the federal claims stated herein is proper in this court pursuant to 28 U.S.C. § 1331 and for the related state claims pursuant to this Court's supplemental jurisdiction under 28 U.S.C. § 1367.  The rights sought to be enforced include Plaintiff's rights guaranteed to her under the 1st, 4th, 5th, 6th, 8th, and 14th Amendments to the United States Constitution.

14. Venue is proper in this Course pursuant to 28 U.S.C. § 1391.  The Defendants all reside in Nebraska and the events giving rise to Plaintiff's claim occurred in Nebraska.

## HISTORY OF UNDERLYING CRIMINAL CASE AND FACTUAL BACKGROUND

15. In 2011, Plaintiff was working and participating in her religious ministry in the state of Nebraska as a Direct Entry Midwife.

16. At all times material, Direct Entry Midwifery was lawful in Nebraska, was not prevented or sanctioned by any statute in Nebraska, and was not subject to licensure under the Nebraska Credentialing Act (Neb. Rev. Stat. §38-103).

17. Plaintiff has practiced Direct Entry Midwifery as both a career and as a form of religious practice for approximately three decades.

4

18. Plaintiff is a devout Christian whose sincere religious belief is that her practice and ministry as a Direct Entry Midwife is based in scripture. It is Plaintiff's strongly held belief that her practice and work as a Direct Entry Midwife is her religious ministry and an essential part of her religious practice.

19. Plaintiff was contracted by Jeff and Whitney Fenske to spiritually minister to and support Whitney during her pregnancy and in the delivery of their child. The engagement was memorialized by written agreement signed by Judy Jones, Jeff Fenske and Whitney Fenske on April 15, 2011 and attached hereto as Exhibit 1.

20. At no point in time did Plaintiff hold herself out to be a certified-nurse midwife, physician, surgeon, or registered nurse. In fact, the Fenskes received a written disclosure from Plaintiff in which Plaintiff denied being a physician, surgeon, registered nurse, or certified nurse midwife. A copy of the written disclosure is attached hereto as Exhibit 2.

21. Part of the arrangement between Plaintiff and the Fenskes was that the Fenskes would have a standby physician, Dr. Angela Pruden, of Broken Bow, Nebraska, in the case of medical emergency.

22. At 5:21 a.m., on September 24, 2011, Whitney Fenske gave birth to a son, Eli Fenske, at her home with her husband, Jeff Fenske, and Plaintiff present.

23. The birth itself was uneventful.

24. Not long after his birth, Eli's breathing became problematic and he struggled to sustain breathing on his own. Plaintiff suctioned Eli's airway to help clear his airways and later performed rescue breathing.

25. Plaintiff and the Fenskes recognized that they needed to get Eli to a hospital. Eli was transported to the emergency room at Jennie M. Melham Memorial Medical Center in

Broken Bow, Nebraska. Plaintiff continued to provide rescue breathing to Eli as needed during transit.

26. On September 24, 2011 at approximately 8:10 a.m. Eli arrived at the Broken Bow Emergency Room and was seen by the Emergency Room staff physician Dr. Angela Pruden. Eli presented with the same recurring apnea caused by extremely low blood sugar that presented after his birth.

27. At the emergency room in Broken Bow, Nebraska, Eli was given glucose, however the medical staff was unable to stabilize his blood sugar and Eli continued to struggle with breathing.

28. The medical staff at Jennie M. Melham Memorial Medical Center failed to diagnose Eli with hypoglycemia which was caused by his congenital Smith-Lemli-Opitz syndrome.

29. On September 24, 2011 at 11:30 a.m. Eli was transported to Good Samaritan Hospital in Kearney, Nebraska for further treatment.

30. While being transported to Good Samaritan Hospital, Eli began having seizures.

31. The medical staff at Good Samaritan Hospital failed to diagnose Eli with hypoglycemia which was caused by his congenital Smith-Lemli-Opitz syndrome.

32. On September 24, 2011, Eli was subsequently airlifted to University of Nebraska Medical Center in Omaha, Nebraska.

33. On September 24, 2011 at 3:23 p.m Eli was admitted to the University of Nebraska Medical Center in Omaha. Upon admission, Eli presented with respiratory distress syndrome, hypoglycemia and seizures.

34. The medical staff at University of Nebraska Medical Center failed to diagnose the underlying cause of Eli's continued hypoglycemia, which was Smith-Lemli-Opitz syndrome.

35. Due to a large cerebral infarct involving several areas of the brain caused by protracted hypoglycemia, Eli failed to respond to treatment.

36. On October 10, 2011, while at the University of Nebraska Medical Center in Omaha, Eli was placed on hospice care and discharged on October 11, 2011.

37. Eli survived for twenty-six days after birth, but eventually died on October 20, 2011 from dehydration and malnutrition secondary to withdrawal of food and fluids on hospice care.

38. According to the coroner physician, Dr. David J. Jaskierney, the cause of Eli's death was the intentional withholding of nutrition and hydration.

39. The coroner physician also testified at deposition that Eli's cause of death could not have been the brain injury due to the fact that he survived for several days before he succumbed due to lack of nutrition and hydration.

40. Eli suffered these brain injuries due to complications from prolonged and unrelenting hypoglycemia, caused by Smith-Lemli-Opitz Syndrome, which went undiagnosed by the medical professionals at each of the three hospitals in which he was seen.

41. This diagnosis was made by Dr. Janice Ophoven on September 11, 2015, who was engaged by the Defendant to review all relevant records in order to render an opinion as to the cause of death of Eli Fenske.

42. Smith-Lemli-Opitz Syndrome is a serious congenital metabolic disorder of cholesterol metabolism which causes structural abnormalities in the body.

43. Eli would have needed to have been given a continuous external source of glucose to prevent extreme hypoglycemia and the subsequent effects of continuously insufficient glucose levels.

44. Consequently, the permanent brain damage that Eli suffered did not occur in the short period of time when Plaintiff was supporting the Fenskes and in no way was a result of any of the Plaintiff's actions, prior to, during or post birth.

45. Plaintiff referred the Fenskes to get medical attention for Eli in a timely manner, which they obtained.  However, the medical professionals who provided care to Eli failed to correctly diagnose Eli's true condition.  This failure allowed the hypoglycemia to go untreated for a sufficient time that permanent brain damage occurred.

46. Given the congenital nature of Eli's complications and subsequent lack of proper treatment by the hospitals and attending physicians, in conjunction with the undiagnosed Smith-Lemli-Opitz Syndrome, Eli Fenske would have experienced the same complications and brain damage had he originally been delivered by a licensed Certified-Nurse Midwife or licensed physician.

47. Subsequent to Eli's death, the Defendant Nebraska State Patrol, specifically Defendants Rogers and Kober, conducted an investigation into the death of Eli Fenske.

48. During the course of their investigation, Defendants Rogers and Kober interviewed Jeff Fenske, Whitney Fenske, Dr. Angela Pruden, Dr. David Bolam and contacted the State of Nebraska Licensure Unit of DHHS.

49. Defendants Rogers and Kober failed to obtain a copy of the medical records of Eli Fenske, obtain a copy of the coroner physician's autopsy report, interview the coroner physician, obtain prenatal health records of Whitney Fenske, interview Whitney Fenske regarding any prenatal care and testing and interview the physicians who treated Eli Fenske at Good Samaritan Hospital in Kearney, Nebraska.

50. Defendant Investigator Jeff Rogers, of the Nebraska State Patrol, relied solely on the summary statement of a medical doctor, Dr. David Bolam at the University of Nebraska Medical Center in Omaha, to erroneously conclude that Plaintiff had been reckless in her care of the infant Eli Fenske.

51. Dr. Bolam, who subsequently treated Eli at the University of Nebraska Medical Center in Omaha, was not present at Eli's birth, and thus had no first-hand knowledge of what occurred at the time of Eli's birth.  Furthermore, he conducted no independent investigation into the facts and circumstances of Eli's birth.

52. Defendant Rogers and Defendant Kober ignored crucial evidence that would have easily been found by conducting a thorough investigation, including obtaining a copy of the coroner physician's autopsy report, determining the circumstances of the hospitalization of Eli Fenske and his true cause of death, and determining what actions Plaintiff had taken that could have constituted practicing medicine, surgery, or nursing without a license.

53. On or about December 10, 2012, Defendant Rogers presented the Custer County Attorney's Office with an Affidavit for Arrest Warrant signed by Defendant Rogers requesting that the Court issue a warrant for the arrest of Plaintiff, for manslaughter, a class III felony.

54. All Defendants named herein failed to obtain any reliable, informed expert medical opinion to determine Eli Fenske's true cause of death prior to commencing or continuing their investigation and prosecution of Plaintiff.

55. Defendant Rogers and Defendant Kober were supervised by the Custer County Attorney's Office, including Defendant Bowers and Defendant Clark.

56. On or about December 10, 2012, Plaintiff was charged in a complaint by Defendant Clark of the Custer County Attorney's Office, acting on behalf of Defendant, Custer County, with manslaughter for causing the death of Eli Fenske, a class III felony at the time.

57. On or about March 21, 2013, Defendant Clark of the Custer County Attorney's Office, acting on behalf of Defendant Custer County, filed amended charges in a complaint against Plaintiff, specifically, Manslaughter for causing the death of Eli Fenske, a Class III Felony, and Practicing Without a License, for practicing medicine, a Class III Felony at the time.

58. Defendants Bowers and Clark claimed Plaintiff violated the requirements of the Credentialing Act, even though there are no licensure requirements in Nebraska for Direct Entry Midwives and Plaintiff was not engaging in any of the activities requiring licensure under the Act.

59. Pursuant to the terms of the Credentialing Act, any criminal or civil enforcement actions under the Act must be initiated by the Nebraska Attorney General.

60. Defendants Bowers and Clark violated the requirements of the Credentialing Act by commencing criminal prosecution without the action being initiated by the Nebraska Attorney General's Office.

61. On April 4, 2013, the original Complaint that was filed on December 10, 2012 and Amended Complaint that was filed on March 21, 2013, were dismissed by Judge Alan Brodbeck of the Custer County Court following a preliminary hearing.

62. In its Order of Dismissal, the County Court cited a general lack of evidence and also noted that the prosecution had been initiated by the Custer County Attorney's office, rather than the Attorney General, in violation of the provisions of the Credentialing Act.  A copy of the Order of Dismissal is attached hereto as Exhibit 3.

63. Thereafter, no additional investigation was conducted by the Defendant Nebraska State Patrol, Defendant Sankey, Defendant Rogers, Defendant Kober, Defendant Custer County Attorney's office, Defendant Clark or Defendant Bowers.

64. Furthermore, no additional evidence was obtained by the Defendant Nebraska State Patrol, Defendant Sankey, Defendant Rogers, Defendant Kober, Defendant Custer County Attorney's office, Defendant Clark or Defendant Bowers.

65. Defendant Sankey failed to properly supervise Defendants Kober and Rogers during their investigation.

66. On or about June 13, 2013, Plaintiff was charged by the Custer County Attorney's Office, acting on behalf of Defendant, Custer County, with manslaughter for causing Eli Fenske's death, practicing medicine or nursing without a Nebraska license, criminal impersonation, child abuse for committing a negligent offense resulting in the death of a child and child abuse for committing a knowing and intentional offense which results in the death of a child.

67. On or about June 13, 2013, Defendants Bowers and Clark, while acting in their official capacity on behalf of Custer County, Nebraska, refiled the charges against Plaintiff without following the requirements of the Credentialing Act and without obtaining or pursuing any additional evidence supporting an allegation of Plaintiff's guilt of any of the charged offenses.

68. Defendants Bowers and Clark again filed these charges, which drew a different judge, without any new evidence proving elements of the charged offenses.

69. On July 31, 2017, the matter was bound over to District Court.

70. Defendant Bowers and Defendant Clark misrepresented to the court that witnesses would testify to elements of the charged offenses or they facilitated this misrepresentation to the court.

71. The autopsy conducted on Eli Fenske was authorized by the Defendant Custer County Attorney's Office, acting on behalf of Defendant, Custer County.

72. This autopsy was properly performed, however the Defendant Custer County Attorney, as coroner under Nebraska law, failed to properly supervise the personnel who prepared the death certificate from the autopsy report.

73. The death certificate prepared by the Defendant Custer County Attorney's office did not reflect the information obtained during the autopsy as contained in the coroner physician's autopsy report.

74. Furthermore, the coroner physician, Dr. David Jaskierney, stated at deposition taken by Plaintiff's counsel on June 30, 2015 that to his knowledge neither Defendant Bowers or Defendant Clark had ever consulted with him regarding the findings contained in his autopsy report.

75. The information provided on the death certificate was materially incorrect and the coroner physician, Dr. David Jaskierny, at deposition disagreed with several statements found on the death certificate.

76. Dr. David Jaskierny further testified that at no time had any investigators with the Defendant the Nebraska State Patrol or Defendant Custer County Attorney's office ever contacted him prior to the deposition to discuss Eli Fenske's death or the findings contained in his autopsy report.

77. On October 19, 2015, the refiled charges were dismissed by the Custer County Attorney after four years of relentless, malicious, and baseless efforts to criminally prosecute Plaintiff.

78. During the lengthy pendency of the charges, Plaintiff's business and religious practice as a Direct Entry Midwife was destroyed in the state of Nebraska and her reputation was irrevocably tarnished.  Recurring media accounts of the circumstances of Eli's death always prominently identified Plaintiff and the pending criminal prosecution.

79. Following the initial filing of the criminal charges referenced above, a condition of the Plaintiff's bond, set by the Court on December 12, 2012, was to cease practice as a midwife.

80. Among the home-birthing community, Plaintiff has been demonized as the media has never corrected the statements published by Defendants Bowers and Clark, acting on behalf of Custer County, that Plaintiff was criminally responsible for the death of Eli Fenske.

81. Plaintiff has suffered damages in the form of legal fees, extensive travel and lodging costs related to recurring mandated court appearances, other expenses related to the prosecution, including the costs of obtaining the opinions of expert witness Dr. Janice Ophoven as for the cause of death of Eli Fenske, lost profits, lost clients, lost prospective business, damage to her reputation, loss of her freedom to practice her religious beliefs and loss of her liberty by being confined in Yankton County Jail and the Custer County Jail for approximately 7 days and for other damages to be proven at trial.

82. Additionally, a week before Plaintiff was scheduled to face a criminal jury at trial on the charges being advanced by Defendants, Plaintiff's husband suffered a heart attack and died after spending over a week in the hospital.

83. Additionally, Plaintiff's husband was under severe stress at the thought of his wife being imprisoned. Plaintiff's income primarily supported the family and Plaintiff's husband feared that her imprisonment would cause them to lose their house.

84. His death was due, at least in part, to the stress of the felony charges and the impending trial and potential incarceration of his wife. Plaintiff's husband had experienced cardiac problems prior to his fatal heart attack, however refused to seek medical attention due to the cost, as Plaintiff and her husband were already extremely financially burdened by the prosecutorial proceedings.

85. Defendants did not at any time make any attempt to determine the actual truth in their investigation of Eli's death. Defendants were motivated by a desire to gain any conviction, at any cost, in violation of Plaintiff's rights.

86. Defendants, individually and acting in concert, deliberately and with reckless disregard for the truth, pursued a meritless and vindictive prosecution of Plaintiff.

87. Acting individually and in concert, Defendants violated Plaintiff's constitutional right to be free from unreasonable seizure, false confinement, and malicious prosecution. The arrest, prosecution, and confinement of Plaintiff violated her rights under U.S. Constitution Amendments I, IV, V, VI, VIII, and XIV.

88. The conduct of Defendants set forth above resulted in Plaintiff's unlawful arrest, prosecution, and incarceration. As a result, Plaintiff suffered and endured false imprisonment and caused her to suffer a loss of her right to personal privacy and personal liberty. Defendants' conduct has caused Plaintiff to endure extreme mental anguish, humiliation, embarrassment, and loss of earnings, all to her special and general damage in an amount to be determined at trial.

89. All named Defendants are accountable under 42 U.S.C. § 1983 because they established policies and practices that were intended to, and did, encourage, endorse and reward their agents and employees for violating Plaintiff's constitutional rights and the rights of similarly situated persons. At the very least, all Defendants named herein acted with deliberate indifference to such constitutional rights.

## COUNT I: 42 U.S.C. § 1983—Malicious Prosecution

90. Defendants deliberately and purposefully brought about Plaintiff's arrest, confinement and prosecution by acting with deliberate indifference to Plaintiff's constitutional rights.

91. The arrest, prosecution, restriction of religious practice and confinement of Plaintiff was deliberately and purposely brought about by Defendants, and was the obvious and intended result of the investigation of Eli Fenske's death conducted so as to prove a case against Plaintiff despite her actual innocence, which was known or should have been known in the absence of Defendants' deliberate indifference to Plaintiff's constitutional rights.

92. Defendants, individually and acting in concert, omitted evidence and utilized demonstrably unreliable and misleading evidence to support their charges of manslaughter for the sole purpose of justifying the arrest, trial, and incarceration of Plaintiff.

93. If Defendants had not been deliberately indifferent to Plaintiff's constitutional rights, they would have known that Plaintiff was actually innocent of any crime accused.

94. In their investigation, Defendant Custer County Attorney's Office, Defendant Bowers, Defendant Clark, Defendant Nebraska State Patrol, Defendant Sankey, Defendant Rogers, and Defendant Kober used evidence that was false, misleading and demonstrably unreliable for the deliberate purpose of:

A.  Providing probable cause for the arrest, extradition from South Dakota to Nebraska, and confinement of Plaintiff;

B.  Persuading the Court to set an unreasonably high bond;

C.  Corrupting the judicial system so that Plaintiff was forced to endure multiple judicial proceedings for crimes she did not commit;

D.  Judge shopping within the county court in order to refile their criminal case against Plaintiff;

E.  Requesting, obtaining and seeking to enforce an Order of the Court to restrain Plaintiff from engaging in her religious practice and ministry of Direct Entry Midwifery in the State of Nebraska; and others to be proven at trial.

95. Defendants' actions constitute a violation of Plaintiff's Federal Civil Rights brought about by Defendants' restriction and prohibition of Plaintiff's free exercise of religion and unreasonable seizure of Plaintiff in violation of the First, Fourth and Fourteenth Amendments to the Federal Constitution.

96. Defendants' actions constitute a violation of Plaintiff's Federal Civil Rights in that they deprived Plaintiff of her liberty without due process of law in violation of the Fifth and Fourteenth Amendments to the Federal Constitution.

97. Defendants' actions deprived Plaintiff of her Federal Civil Right to a speedy public trial by an impartial jury in violation of the Sixth and Fourteenth Amendments to the Federal Constitution.

98. Defendants' actions constitute deliberate infliction of cruel and unusual punishment upon Plaintiff regarding her incarceration for a crime she did not commit in violation of her

Federal Civil Rights granted to her under the Eighth and Fourteenth Amendments to the Federal Constitution.

99. In their investigation Defendants Bowers, Clark, Rogers, and Kober solicited, fabricated, and manufactured evidence that was false, misleading and demonstrably unreliable for the deliberate purpose of:

    A. Providing probable cause for the arrest and confinement of Plaintiff;

    B. Persuading the Court to set an unreasonably high bond ($500,000) to make it extremely difficult for Plaintiff to secure her release from jail;

    C. Corrupting the judicial system so that Plaintiff could not possibly receive a fair trial, and thereby attempt to coerce her to plead guilty to crimes she did not commit.

    D. Utilizing judge shopping techniques to obtain the desired judicial result; and for others to be proven at trial.

100. Defendants' actions constitute an unreasonable seizure of Plaintiff in violation of the Fourth and Fourteenth Amendments to the Federal Constitution.  Defendants' actions deprived Plaintiff of her liberty without due process of law in violation of the Fifth and Fourteenth Amendments to the federal Constitution.  Defendants' actions deprived Plaintiff of her right to due process under Fourteenth Amendment to the Federal Constitution.  Defendants' actions constitute deliberate infliction of cruel and unusual punishment upon Plaintiff regarding her pretrial incarceration for approximately 7 days for crimes she did not commit in violation of the Eighth and Fourteenth Amendments to the Federal Constitution.

101. Defendants' actions were the direct and proximate cause of damage and harm to Plaintiff, including incarceration for 7 days for crimes she did not commit, the attendant loss of freedom, companionship, income and earning capacity, as well as the attendant infliction of

psychological and physical harm, anguish and fear, including the fear of being imprisoned for up to life and fined up to one hundred-thousand dollars ($100,000) for crimes she did not commit.

### COUNT II: 42 U.S.C. § 1983 -- CONSPIRACY TO VIOLATE CIVIL RIGHTS

102. Defendants, together and under the color of law, reached an understanding, engaged in a course of conduct and otherwise conspired among and between themselves to deprive Plaintiff of her constitutional rights, including her right to the free exercise of religion, her right to free association and privacy, to be free from unreasonable arrest and seizure, to be free from wrongful imprisonment and punishment, to be free from malicious prosecution and abuse of process, to fair access to the courts, to due process of law, and to be free from cruel and unusual punishment for a crime that she did not commit.

103. Defendants, together and under the color of law, committed the overt acts set forth above, culminating in the unwarranted arrest, extradition, detention, and prosecution of Plaintiff. Defendants deliberately and purposely solicited unreliable and unscientific evidence, hearsay statements and evidence, filed false or misleading investigative reports and ignored scientific evidence, all for the purpose of prosecuting Plaintiff for crimes she did not commit. Defendants either knew or if they had not been deliberately indifferent to the truth and Plaintiff's constitutional rights, would have known that she was in fact innocent of the crimes of manslaughter, practicing midwifery without a license, criminal impersonation, child abuse for committing a negligent offense resulting in the death of a child and child abuse for committing a knowing and intentional offense which results in the death of a child  with regard to the tragic death of the infant Eli Fenske.

18

104. Defendants' acts violated Plaintiff's constitutionally protected rights.  The conspiracy and overt acts in furtherance thereof have caused Plaintiff to suffer damages for deprivation of constitutional rights, psychological and emotional injury, incarceration, humiliation, embarrassment, and loss of freedom, companionship, income, and the capacity to earn income.

**COUNT 3: 42 U.S.C. § 1983 -- VIOLATIONS COMMITTED BY CUSTER COUNTY**

105. Custer County, by and through its relevant final policy maker, the Custer County Attorney, and by and through its agents, both before and at the time of the events alleged in this complaint, had in effect policies, practices, and customs that operated to deprive Plaintiff of her constitutional rights.

106. The policies, practices, and customs include, but are not limited to the following:

   A. A policy, practice, and custom of failing to properly train and supervise officers in the techniques of investigating and prosecuting serious crimes;

   B. A policy, practice, and custom of using investigative and prosecutorial techniques that had an extreme likelihood of obtaining false and unreliable information from witnesses, including expert witnesses;

   C. A policy, practice, and custom of failing to supervise law enforcement officers who violate the Constitution or law or otherwise act to violate the rights of criminal suspects during the course of a criminal investigation and prosecution;

   D. A policy, practice, and custom of investigating and prosecuting crimes in a manner designed to prove a case against a convenient and/or unpopular suspect by procuring unreliable evidence and, when necessary, relying on obviously flawed evidence without

regard to whether policies, practices, and customs might result in the conviction of persons who are actually innocent;

E. A policy, practice, and custom of being deliberately indifferent to the violation of the rights of a suspect by an officer or employee;

F. A policy, practice, and custom of using judge shopping techniques to obtain the desired judicial result;

G. A policy, practice and custom of manipulating the criminal justice system as a means of violating one's guaranteed First Amendment right; and others to be proven at trial.

107. The policies, practices, and customs, separately and together, were deliberately and purposefully implemented to deprive the targets of criminal investigations and prosecutions of their constitutional rights, or at the very least, were implemented with a deliberate indifference to the rights of a target of a criminal investigation and prosecution, and were a direct and proximate cause of the violation of Plaintiff's Constitutional rights and the injuries visited upon her as set forth above.

108. The actions of all Defendants caused Plaintiff to suffer psychological distress, humiliation, embarrassment and other damages for which she is entitled to monetary relief. The intentional or reckless misconduct of the all the Defendants, as set forth above, furthermore entitles Plaintiff to punitive damages in an amount to be determined at trial. Such actions were deliberate, reckless, wanton and cruel, with total and deliberate indifference to Plaintiff's rights as a citizen and a human being.

WHEREFORE, Plaintiff prays for judgment against the defendants as follows:

A. Damages in an amount that will fairly and justly compensate her for the violation of her civil rights, her pain and suffering, loss of consortium, her lost earnings, loss of reputation and her loss of her capacity to earn income;

B. Punitive damages in an amount sufficient to adequately punish defendants and to deter future conduct of the kind inflicted upon Plaintiff;

C. Attorney's fees pursuant to 42 U.S.C. § 1988;

D. An order enjoining Defendants from destroying any evidence in this matter and compelling them to preserve and not alter such evidence; and

E. The costs of this action and for such other and further relief as this Court deems equitable and proper.

## JURY DEMAND AND DESIGNATION OF PLACE OF TRIAL

Plaintiff demands that all causes of action in this case be tried to a jury in Omaha, Nebraska.

DATED this _____ day of October, 2017.

JUDY K. JONES, Defendant


By:    <u>s/Stuart J. Dornan</u>
        STUART J. DORNAN, #18553
        VICTOR F. LAPUMA, #20923
        DEANA D. KLEIN, MBE #63529
        Attorneys for Plaintiff
        Dornan, Troia, Howard
        Breitkreutz & Conway PC LLO
        1403 Farnam Street, Suite 232
        Omaha, Nebraska 68102
        (402) 884-7044 (phone)
        (402) 884-7045 (fax)
        stu@dltlawyers.com
        vic@dltlawyers.com
        deana@dltlawyers.com


By:    <u>/s Kirk E. Goettsch</u>
        KIRK E. GOETTSCH, #22368
        Attorney for Plaintiff
        Goettsch Law Firm, LLC
        3628 N. 163rd Plaza
        Omaha, NE 68116
        (402) 210-2407 (phone)
        (402) 909-0626 (fax)
        keg@goettschlaw.com

## Home Birthing Parent(s) Agreement

We have chosen to have a home birth, based upon what we believe to be a thorough examination of the alternatives, including discussions with knowledgeable people and physicians to the extent we think necessary.

We have asked Judy to be the midwife at our home birth. Judy has discussed the information on the previous pages and discussed her philosophy and experience with us. Before signing this agreement, we have had a chance to talk with Judy and ask her questions. We have also been advised of other birth options in the general area. We have discussed our proposed home birth adequately and understand and agree to the following:

1.     Judy is a Direct-Entry Midwife (DEM), NOT a doctor or Certified Nurse Midwife (CNM). She is not licensed by any government agency, however, she is recognized and certified by the North American Registry of Midwives (NARM) as an experienced Certified Professional Midwife (CPM).

2.     It is impossible at a home birth to provide the same type of care that is available at a hospital. For example, in a hospital there would be more attendants available, as well as more equipment, monitoring devices and surgical apparatus, various medicines, blood plasma, etc. We are fully aware that in the event of a complicaton or emergency, there are fewer alternatives available at home birth than there would be in a hospital. Consequently, in the event of a serious complication, there may be additional risks to the baby and/or mother.

3.     We believe that birth is a natural, generally safe process. We have, however, discussed some of the problems which can arise in childbirth, such as placenta abruptio, placenta previa, malpresentations, hemorrhage, birth defects, genetic disorders and stillbirth.

4.     It may become necessary during the birth to transfer the mother and/or baby to the hospital. We may choose to do so at any time, or if Judy believes it is necessary to transport mother/baby to the hospital, either during the birth or postnatally, we agree to do so upon her request. We understand that if we do not cooperate with Judy's desire to transport, we may jeopardize our family, her family and midwifery as a whole in our state.

5.     We agree that it is our responsibility to make a back up plan for the possibility of transport and to contact the physician of our choice for back up, both during pregnancy and delivery. We also agree that it is our responsibility to take the baby to a physician for a newborn physical examination.

6.     There are various medical diagnostic tests available, such as amniocentesis, alphafetaprotein testing and ultrasound to detect genetic abnormalities



**EXHIBIT**

1

or other problems.  Judy has no expertise nor training in these aspects of prenatal care.  The advisability or need for such tests should be discussed with a licensed health practitioner.

7.     We agree to eat a nutritional diet, to exercise, avoid harmful substances (drugs, alcohol, caffeine and tobacco) and to otherwise do our best to maintain excellent health in pregnancy, including attending scheduled prenatal appointments.

8.     We have discussed with Judy many potential personal risk factors as referenced above.  We realize there are probably many other risk factors we have not discussed.  However, we agree to assume all other risks (known and unknown) and accept the responsibility to gather and explore any other information and options we believe to be necessary or important.  We, the parents, hereby accept full responsibility for any and all complications which may arise.

9.     We also agree that a laborer is worthy of her hire and desire to support this ministry with an offering.  We are aware of Judy's suggested donation and agree to work out a schedule for reimbursement by date of delivery.  If we are in difficult financial circumstances, we will discuss this and make proper arrangements with Judy.

We hereby sign, realizing that we are ultimately responsible for our own state of health, agreeing to the above terms of responsibility.

Client's signature_____

Spouse's signature_____

Midwife's signature_____

Date:_____

Our Comments:_____

_____

_____

_____

_____

# INFORMED DISCLOSURE STATEMENT

This information has been compiled to serve as an "Informed Disclosure Statement" to clients and potential clients, to help expectant parents choose a competent care provider to share in the responsibility for their own health.

I believe that pregnancy and childbirth are normal, natural states of health. I believe that God has given the innate knowledge of childbearing to every woman and that process usually enables you to birth your child without interference. On a rare occasion, interference, either minor or major, may be necessary, but only then should interference be used.

I believe the definition of a midwife is "with woman". My job as a midwife is to be with the mother during her pregnancy and delivery as a supporter, encourager, source of information and strength. My role is to enhance the choices of the family and honor them. If, for reasons of safety, I disagree with the family's choice in a matter, we will discuss the matter and I will honor their decision, but it may be necessary for me to terminate our relationship.

I expect parents to assume an extra degree of responsibility for their own health care and for the outcome of their birth.

## Prenatal Care

I believe strongly in preventive health care, and I feel good prenatal care is the best way to avoid and prevent complications before they arise. I expect the parents to become knowledgeable about pregnancy and childbirth, and I will assist them in gaining information on nutrition, relaxation, pregnancy and childbirth. However, you must be responsible for maintaining your own health. For instance, I can tell you what you should eat, but you must be the one to eat in a healthy way.

I encourage beginning prenatal care early in pregnancy. I will see you for prenatal visits once monthly through the first 7 ½ months of pregnancy. After that time, visits will be closer with weekly visits the last 3 weeks until your due date, and afterwards until birth. Additional visits may be scheduled if needed. At least 2 prenatal visits must be in your own home. I do ask mileage payment for visits that I make in your home or away from my home.

I require every family to have a back up plan in case a transport is necessary. I highly recommend you have a back-up physician of your choice, who has seen you during this pregnancy and is aware of your home birth plan. You must see some licensed care provider at least once to verify this pregnancy to obtain a birth certificate later.



EXHIBIT

2

**Labor and Birth**

I will come to be with your during your labor and delivery. Because distance is often a factor, I prefer to be called early. I will stay with you and support you as much or as little as you desire. I do check vital signs for you and especially your baby at intervals.

I will record the 3events of your birth. The extent of my involvement and that of your spouse and other children will be the family's choice. I usually remain after the birth for 3 to 4 hours or as needed. If a transport should become necessary, I will go to the hospital with you if necessary, although my role in a hospital situation would necessarily change because of hospital regulations.

**Postpartum**

I will do a basic newborn exam after birth. I usually make two postpartum visits with mother and baby. Additional visits will be made if needed. I will always be available for phone contact throughout the pregnancy and postpartum period. The parents should schedule a newborn exam with their family physician and do the newborn blood screening as required by their own state. Birth certificate registration is the responsibility of the parents.

**Background and Experience**

I was born at home in Springfield, South Dakota. I am married and have six children, five alive and one in Heaven. Our first four children were born in a the hospital, before I became wiser, and my last two were born at home.

I am a Christian and I am a midwife because I believe that this is the ministry to which God has called me.

I am a Direct-Entry Midwife. I am not a Certified Nurse Midwife. I do have an RN nursing background, but do not hold a current RN license. I have an inactive RN license in Missouri and Iowa.

A certified Nurse Midwife is an RN who has received additional institutional midwifery training from the medical perspective and has taken the ACNM (American College of Nurse Midwives) exam. She is then licensed by the state in which she practices and must have a practice agreement to work under a specific physician. Most CNMs work in hospitals or birth centers. Very few CNMs do home births because they have not been trained in that area.

A Direct-Entry Midwife has learned midwifery by some other educational route, usually apprenticeship and self study, although there are a few Direct-Entry schools. They usually practice a home. The may or may not be licensed or regulated by state law. Some (the number is increasing) have sought national certification with NARM (North American Registry of Midwives). I took their exam in 1992 and been examined for

competency and experience. I have been certified by them as a Certified Professional Midwife (CPM) since 1995 and do continuing education to maintain that certification.

Direct-Entry Midwives try to maintain a more natural philosophy of pregnancy and childbirth rant than the allopathic medical perspective that pervades CNM (Certified Nurse Midwife) training.

I began attending home births in 1984. At that time, I did not intend to become a midwife, but the Lord had other plans and kept drawing me further and further along. I apprentice for 1 ½ years with another Direct-Entry Midwife who taught me a great deal. I did a lot of self-study also, and when she left the area, people continued to call me and ask me to help with their births. From a small beginning, it has grown to a busy schedule. I have grown in my midwifery knowledge and continue to learn new things all the time. I attend conferences as I am able and talk with peer whenever I can to learn new things. I have been Coordinating Chairperson in the past of **South Dakota Safe Childbirth Options** and each year they sponsor a Healthy Birth Conference and bring in special speakers. I am currently president of **South Dakota Midwives' Guild**, an organization of fellowship, training and peer review for midwives, doulas and birth attendants.

I am a member of MANA (Midwives Alliance of North America, an international professional organization of Direct-Entry Midwives, and Citizens for Midwifery (CFM).

I have currently assisted with, or "caught" _____ babies.

Legal Status

Legal status of Direct-Entry Midwifery in South Dakota has changed over the years from legally recognized to now illegal. This has not been done by the SD Legislature, but rather by judicial interpretation of the CNM law. I have faced numerous charges of practicing as a Certified Nurse Midwife without a license over the last years. In 1993 an injunction was place against me to not practice as a Certified Nurse Midwife. In 1995 I was found not guilty by a jury in Yankton, SD, of practicing as a Certified Nurse Midwife. In 1996 the Board of Nursing took me to court for violation of my injunction and I was found in contempt of court because my name had been put on a birth certificate as an "other midwife". In 2003 I was found guilty on 4 counts of "practicing unlicensed midwifery" (basically practicing as a CNM without a license. I had to pay a $1000 fine and spend 30 days in jail for that. The rest of the jail time was suspended. The SD Board of Nursing also filed repeat contempt charges against me and I had to make an agreement with them. Because of these legal actions, I can no longer attend births in South Dakota until some legislative changes are made to recognize Direct-Entry Midwives or Certified Professional Midwives in South Dakota. If I assist a South Dakota family it would need to be outside of the state of South Dakota at this present time.

South Dakota Safe Childbirth Options (SDSCO is actively working for legislation to gain this recognition. We would appreciate your involvement as well.

Direct-Entry Midwifery in Nebraska and Iowa is not illegal, but not legally recognized either. A midwife has been charge with practicing as a CNM without a license in Nebraska and those charge were subsequently thrown out of court. I have received a Cease and Desist order from Nebraska to not practice as a CNM. I do not practice as a CNM. Other midwives in Nebraska have recently received Cease and Desist orders to not practice medicine there. They do not do that either. Iowa has also sent me a Cease and Desist order to not practice medicine in Iowa. So things are shaky in both states and legislation to recognize the rights of home birth parents to have the attendant of their choice also needs to be worked on in these two states. I do still practice as a CPM in those states.

Direct-Entry midwifery is recognized in Minnesota law. In 1999 they passed a voluntary licensure mechanism using the CPM certification of NARM. At this time I am considering becoming state licensed in Minnesota, since I already have my CPM certification, but may not as long as the licensure is still voluntary.

If you have any questions about this area, please ask me.

IN THE COUNTY COURT OF CUSTER COUNTY, NEBRASKA

THE STATE OF NEBRASKA,                    )
                                          )   CASE NO. CR12-469
                         Plaintiff,       )
                                          )   ORDER
vs.                                       )
                                          )
JUDY K. JONES,                            )
                                          )
                         Defendant.       )

FILED
CUSTER COUNTY COURT

APR   4 2013

Debra D. Hansen
Clerk Magistrate
by Roberta Meschke

Now on this _4th_ day of April, 2013, this matter comes on for an order on the preliminary hearing.  With regard to count two, practicing without a license, the Court finds that the governing statute requires that the Attorney General file either criminal or civil proceedings with regard to violation of the licensing statutes.  It appears clear from the statute that it is the Legislature's intent that the Attorney General enforce said provision and since the Legislature has granted exclusive authority to the Attorney General the county attorney may not, without authorization from the Attorney General, file a complaint with regard to the licensing provisions of the statutes.  The Court therefore finds that the county attorney had no authority to file the instant charge and is therefore without jurisdiction.  Therefore count two is dismissed without prejudice.

Regarding count one of the amended complaint, the issue that first presents itself is whether there is evidence that the crime of manslaughter has been committed.  In reviewing the evidence presented at the preliminary hearing there was testimony from the state trooper of two different causations of fact that resulted in the death of the child. The death certificate apparently lists the cause of death as malnutrition.  Dr. Bowlin informed the trooper that the cause of death was lack of post-birth care.  The testimony indicates that there was no pre-birth difficulties with the pregnancy and consequently, the Court cannot find that there is any evidence to support a conclusion that the defendant was somehow responsible for the malnutrition of the child.  With regard to the assertion that the lack of post-birth care caused the death there is nothing in the record that explains what care was lacking.  There was testimony that the defendant told the doctors of a test result that apparently could not be possible.  To link that single bit of

EXHIBIT

3

000030982C04

testimony to a conclusion that someone caused the death of the victim is a greater leap than the Court is inclined to make in a criminal case of this magnitude.  The Court finds that the State has failed to show that the crime of manslaughter has been committed.

While the Court does not need to analyze this case any further, it also does not appear that the State has presented even probable cause evidence to believe that the defendant is the person who caused the death of the child.  It is therefore the order of the Court that count one be dismissed without prejudice.

BY THE COURT

County Judge